**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL T. ROBSON, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No.  4:19-cv-01862-SRC |
| | ) | |
| DUCKPOND LTD., et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

## Memorandum and Order

The former co-owners and business partners of Duckpond Ltd. accuse each other of foul play in connection with the June 2017 stock buyout of Plaintiff Michael T. Robson.  Docs. 1, 25. Duckpond is a holding company that invests in other companies, and it has a veritable skein of subsidiaries.  Doc. 88 at ¶ 2.   Robson, along with Defendants ICC Global Investments Ltd. and Tharros Emporium Ltd., each owned a third of Duckpond's shares.  Doc. 88 at ¶ 1.  Robson served as Duckpond's treasurer since 2012.  Doc. 88 at ¶ 48.  He sat on Duckpond's financial steering committee alongside his fellow corporate officers, Anders Hummer and Alex Alexandrov, who represented ICC Global and Tharros respectively.  Doc. 88 at ¶ 4.  In mid-2017, Robson sold his Duckpond shares to his co-owners for $3,170,000.  Doc. 88 at ¶ 3.  But two years later, Robson filed suit against Duckpond, ICC Global, and Tharros, claiming that Defendants failed to pay their bill.  Doc. 1.  Defendants counterclaimed, alleging that Robson misrepresented the basis for his stock purchase price, resulting in a bloated value of his Duckpond stock.  Doc. 25.  With a raft of unresolved fact issues swirling around, the parties' competing summary-judgment motions are dead in the water.

I.      **Background**

ICC Global and Tharros purchased Robson's Duckpond stock and signed a promissory note for $3,170,000.  Doc. 88 at ¶ 3.  But less than two years later, ICC Global and Tharros halted payments on the note, claiming that the valuation the parties used to calculate Robson's buyout price violated the Duckpond shareholders' agreement.  Doc. 44 at ¶¶ 11–12; Doc. 80. Robson now seeks to enforce the note.  Doc. 1.

Defendants assert numerous affirmative defenses, as well as three counterclaims, including fraud (fraudulent inducement), breach of fiduciary duty, and breach of duty of loyalty. Doc. 25.  Defendants allege that Robson, acting as Duckpond's treasurer, fraudulently misrepresented Duckpond's valuation and his stock purchase price as complying with a pricing formula in the Duckpond shareholders' agreement.  *Id.*  According to Defendants, they already paid Robson more than enough for his shares, based on the value set by the shareholders' agreement, which was at most $1,064,648.  *Id.*

Before the Court are Robson's motions for summary judgment and partial summary judgment, Docs. 39 and 74, as well as Defendants' Motion for Partial Summary Judgment, Doc. 79.  The Court also considers Robson's Motions to Exclude Expert Testimony of H. Brian Callahan and Brett Abelson, Docs. 72 and 77, as well as Defendants' Motion to Exclude Expert Testimony of Thomas Hilton, Doc. 69.  The Court denies the parties' motions for summary judgment, Docs. 39, 74, and 79, because genuine issues of material fact exist regarding fraudulent inducement.

## II.    Facts

### A.    Undisputed facts

Pursuant to Rule 56(g) of the Federal Rules of Civil Procedure, the Court finds the

following facts not genuinely in dispute and treats them as established in the case.

#### 1.    Robson's stock buyout

Robson, through his Trust, is a former co-owner of Duckpond, along with ICC Global

and Tharros, which each owning a one-third interest in Duckpond.  Doc. 88 at ¶ 1.  Duckpond is

a holding company with various subsidiaries, including ICC, Inc. (not to be confused with the

similarly-named defendant ICC Global).  *Id.* at ¶ 2.  Robson decided to sell his Duckpond shares

in equal parts to ICC Global and Tharros in 2017.  *Id.* at ¶ 3.  For purposes of the stock buyout,

Anders Hummer and Alex Alexandrov acted as representatives of ICC Global and Tharros.  *Id.*

at ¶ 4.

On June 8, 2017, ICC Global and Tharros executed a promissory note for $3,170,000 in

exchange for Robson's Duckpond stock.  *Id.* at ¶¶ 7–8; Doc. 44 at ¶¶ 1–3.  The promissory note

provided that Duckpond had to pay the Robson Trust the principal amount of $3,170,000, plus

4% per annum simple interest accruing from June 8, 2017 to maturity (May 12, 2022), via

monthly payments of $58,380.37 beginning on June 12, 2017.  Doc. 88 at ¶ 10; Doc. 44 at ¶ 3.

Soon after, the parties executed a Share Sale and Purchase Agreement for Robson's Duckpond

stock, giving ICC Global and Tharros each 50% ownership of Duckpond.  Doc. 88 at ¶¶ 5–6;

Doc. 44 at ¶¶ 4–6.  Section 2.3 of the Purchase Agreement stated the following:

> The Parties hereby **waive any and all restrictions and conditions in the
> Shareholders Agreement** and the Articles or any other document, on the transfer
> of shares in respect of Transfers, and they further waive any and all of their
> respective rights of pre-emption, first refusal or similar or related rights with respect
> to the Transfer Shares and the Transfers, of which they avail themselves in
> accordance with Article V of the Shareholders Agreement, Article 5 of the Articles

3

or any other provision of the Shareholders Agreement or the Articles or however so arising, and hereby **consent to the Transfers and all of their terms, including but not limited to the Purchase Price**. For the avoidance of doubt, the Parties agree that the Transfers are in compliance with the Shareholders Agreement and the Articles. **If there is a conflict between the terms of this Agreement and any other agreement between the same parties, the terms of this Agreement shall prevail.**

Doc. 44 at ¶ 7 (emphasis added).  In connection with his stock buyout, Robson negotiated an employment agreement with ICC, Inc., guaranteeing him a position at ICC, Inc. until the end of 2022.  *Id.* at ¶¶ 18–19.

## 2.    Duckpond shareholders' agreement

In 2014, Robson, Hummer, and Alexandrov negotiated an Amended and Restated Shareholders' Agreement for Duckpond Ltd.  *Id.* at ¶¶ 11–12, 15.  Article VI of the Shareholders' Agreement, titled "Purchase Price," contains the following language regarding share transfers in the case of a shareholder's death, disability, or retirement:

The Purchase Price per Share is hereby agreed to be the total Value of the Company, divided by the total number of outstanding Shares in the capital of the Company. **For the purpose of this Article VI, Section 1, for Shares transferred pursuant to Article IV (Death), Article V Section 1 (Disability) or Article V Section 2 (Retirement), "Value" shall mean 3.5 times EBITDA for the Group over the twelve-month period immediately preceding the date on which the Value is determined, PLUS the Group's consolidated net balance of all cash, short term investments and current assets, less liabilities (as assessed under US GAAP)** ("Consolidated Net Current Assets").
. . .
The Shareholders may review the Purchase Price and either decide that there is to be no change or determine a new Purchase Price.

Doc. 88 at ¶¶ 13–14 (emphasis added); Doc. 44 at ¶ 24.  When the parties negotiated the Shareholders' Agreement, Hummer expressed to Robson and Alexandrov that he wanted to include a GAAP requirement in the Article VI Purchase Price formula, to ensure the financials underlying the Purchase Price calculation would be materially accurate.  Doc. 88 at ¶ 18.

4

### 3.     Robson's Duckpond valuation

Until 2017, Robson served as Duckpond's treasurer, in charge of the company's finances and bookkeeping, while Hummer and Alexandrov were in charge of sales and operations.  Doc. at ¶¶ 48–49.  In the months leading up to his stock buyout, Robson prepared several "Duckpond valuation" spreadsheets, which he sent to both Hummer and Alexandrov.  *Id.* at ¶¶ 22–23. Robson labeled all of his valuation spreadsheets with the title:  "Duckpond Purchase Price per Article VI of the Amended and Restated Shareholders Agreement for Duckpond Ltd."  *Id.* at ¶ 26.  The Duckpond valuation spreadsheets use all of the definitions and terminology of Article VI's purchase price formula for share sales upon retirement (i.e., 3.5 times annualized EBITDA plus Consolidated Net Current Assets), with the exception of any mention of GAAP compliance. *Id.* at ¶ 27.  The spreadsheets have line items and calculations for: "EBITDA(Consolidated Net Ordinary Income for the previous 12 months)," "CONSOLIDATED NET CURRENT ASSETS," and "STOCK VALUE(3.5xannualized EBITDA+Net Current Assets)."  *Id.* at ¶ 28.  Robson never communicated any other Duckpond valuation to Hummer and Alexandrov aside from that contained in the valuation spreadsheets.  Robson Dep. 101:22–102:7, 118:4–14.

On April 10, 2017, Robson circulated a Duckpond valuation spreadsheet for the first quarter of 2017.  *Id.* at ¶ 31.  That spreadsheet announced that Duckpond's "STOCK VALUE(3.5xannualized EBITDA+Net Current Assets)" totaled $9,515,504.  *Id.* at ¶ 32.  The parties used the figures in Robson's valuation spreadsheet to determine his buyout price, setting the price for Robson's Duckpond shares at a third of Duckpond's purported $9,515,504 value: $3,170,000.  Doc. 88 at ¶¶ 33–34.  Robson admits that he knew the valuation was not GAAP-compliant and that he knew Hummer and Alexandrov relied on the valuation to determine his

5

buyout price, but he did not inform them that the valuation was not GAAP-compliant.  Robson Dep. 72:22–23, 75:24–76:1, 77:1–3, 81:3–9, 84:4–8.

### 4.      Post-buyout

Defendants halted their payments to Robson in March 2019.  Doc. 44 at ¶¶ 11–12; Doc. 80.  Robson sent Defendants a notice of default in May 2019, followed by an acceleration notice in June 2019.  *Id.* at ¶¶ 11–12, 14.  Robson demanded payment of the remaining balance of $2,094,148.82.  *Id.* at ¶¶ 14–15.  When Defendants did not pay, Robson filed this suit to recover the amount under the promissory note.  *Id.* at ¶¶ 16–17; Doc. 1.

### B.      Disputed facts

The parties' primary dispute is whether Robson actually represented to Hummer and Alexandrov that the Duckpond valuation came from Article VI's Purchase Price formula, which requires GAAP compliance.  Doc. 88 at ¶ 35.  Defendants claim that the valuation spreadsheets' reference to Article VI of the Shareholders' Agreement falsely represents that the $3,170,000 purchase price followed the price formula for retirement in Article VI.  *Id.* at ¶¶ 35–37.  Defendants assert that they would not have entered into the promissory note and Purchase Agreement if they had known that the $3,170,000 purchase price was not based on a GAAP-compliant valuation.  Doc. 88 at ¶ 39.  Defendants state that they believed at the time that Robson had been preparing and using GAAP-compliant financials for some time before his buyout.  *Id.* at ¶ 51.  As evidence that they reasonably relied on Robson's representations, they point to Robson's switch to "accrual" accounting and other significant revisions to Duckpond's financial statements, as well as Duckpond's retention of an outside accounting firm to confirm that their financials were GAAP-compliant .  *Id.* at ¶¶ 51–54.  Defendants claim that they learned

for the first time in late 2018 that the $3,170,000 purchase price was based on financials that did not comply with GAAP.  *Id.* at ¶ 46.

Robson claims that he never actually said that the valuation spreadsheets complied with GAAP and that Hummer and Alexandrov already knew that Duckpond's corporate financial statements were not prepared in accordance with GAAP.  *Id.* at ¶¶ 35–37.  Robson points to previous financial meetings with Hummer and Alexandrov, where the parties discussed switching to GAAP-compliant accounting in the future, as well as a November 2, 2016 email where Alexandrov expressed that a new change in Duckpond's accounting system would "get closer to GAAP."  *Id.* at ¶¶ 37, 51.  Robson further argues that the switch to "accrual" accounting and the retention of an outside accounting firm were merely steps towards making Duckpond's financial statements GAAP-compliant and that Duckpond did not retain the outside accounting firm until long after Robson's stock buyout.  *Id.* at ¶¶ 52–54.

Robson insists that he pressed for a different buyout price in an email to Hummer and Alexandrov on April 24, 2017.  *Id.* at ¶ 58; Doc. 88-10.  He stated in this email that the valuation in Article VI of the Shareholders' Agreement is only for purposes of death, disability, or retirement, and none of those applied, so the purchase price was freely negotiable under the Shareholders' Agreement.  *Id.*  But notably, Robson's email did not mention that the valuation spreadsheet did not comply with Article VI and GAAP.  *Id.*

The parties also dispute whether Robson retired in 2017 after selling his shares, as this may affect whether Article VI of the Shareholders' Agreement actually applied to Robson's stock buyout.  When he signed the promissory note, Robson entered into a separate employment agreement with Duckpond subsidiary ICC, Inc., which lasts until 2022 or until Robson decides to terminate the agreement, whichever is earlier.  Doc. 44 at ¶¶ 18–19.  Robson contends that the

employment agreement is sufficient evidence that he continued to be an "employee" of Duckpond's group of companies, so he did not "retire" within the meaning of the Shareholders' Agreement.  Docs. 45, 44 at ¶ 20.  Defendants counter with Hummer's and Alexandrov's sworn testimony that Robson told them he was retiring and selling his shares according to the retirement provision in the Shareholders' Agreement, and that Robson only entered his employment agreement with ICC, Inc. to keep his health insurance and other benefits.  Doc. 42-1 at ¶¶ 6, 20; Doc. 42-2 at ¶¶ 5, 19.  Defendants further claim that Robson is not an employee of ICC, Inc. under Missouri law because he has not provided services to ICC, Inc. on a regular basis, regularly attended work, submitted timesheets, or worked in excess of 25 hours, so ICC, Inc. does not exercise control over the method or manner of Robson's work.  Doc. 42-1 at ¶¶ 14–19; Doc. 42-2 at ¶¶ 13–18.

## II.    Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)).  In ruling on a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The proponent of the motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

8

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" dispute of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A party attempting to avoid summary judgment through an affirmative defense must demonstrate genuine issues of material fact specifically supporting the affirmative defense. *United States v. Farmers Co-op Co.*, 708 F.2d 352, 353 (8th Cir. 1983). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## III. Discussion

### A. Motions for summary judgment

#### 1. Robson's motion for summary judgment

Robson claims that he is entitled to summary judgment because the uncontroverted facts establish that Defendants breached their obligations under the promissory note. Doc. 39, 40. Robson further argues that each of Defendants' affirmative defenses and counterclaims fail because Defendants knowingly consented to all of the terms in the Purchase Agreement, including the purchase price. *Id.*

Under Missouri law, "[t]he elements for breach of promissory note are: (1) the existence of a valid promissory note signed by the maker; (2) a balance due on the note; and (3) a demand on the maker for payment which has been refused, leaving the maker in default." *Smithville, LLC v. Citizens Bank & Trust Co.*, 2013 WL 434020, at *4 (W.D. Mo. 2013) (citing *Bus. Bank of St. Louis v. Apollo Invs., Inc.*, 366 S.W.3d 76, 80 (Mo. App. E.D. 2012)). Defendants have admitted that: (1) they executed a promissory note worth $3,170,000, (2) they stopped paying the balance in March 2019 without paying the full amount, and (3) they refused to pay anything more after Robson demanded the remaining balance of $2,094,148.92 in May 2019. Doc. 44 at ¶¶ 1, 3, 11–12, 14–16. Thus, as an initial matter, Robson has established the elements for breach of a promissory note.

Defendants raise several affirmative defenses and counterclaims, arguing that they lawfully terminated their performance of the promissory note because Robson's misrepresentations induced them to purchase his shares for an inflated price. Docs. 42, 25; *see also Rodgers v. Czamanske*, 862 S.W.2d 453, 459 (Mo. App. 1993) ("An affirmative defense declares that even if the allegations in the plaintiff's petition are established, the plaintiff cannot prevail because additional facts exist which avoid the legal responsibility of the defendant."). Defendants allege that Robson fraudulently induced Defendants to enter into the Purchase Agreement and breached his fiduciary duties to Duckpond by presenting a non-GAAP-compliant share price in his valuation spreadsheets while purporting to follow the pricing formula in Article VI of the Shareholders' Agreement. Docs. 42, 25. Robson did not inform his co-owners that the Duckpond valuation he presented was not GAAP-compliant, despite knowing that they relied on it for determining the price of his shares. *Id.*

10

To state a claim for fraudulent inducement under Missouri law, a party must prove:  "(1) a false material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the statement; (5) the hearer's reliance on its truth, and the right to rely thereon; and (6) proximate injury."  *Gast v. Ebert*, 739 S.W.2d 545, 547 (Mo. 1987).  Defendants must meet a heavy burden to establish a case for fraudulent inducement.  *Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 634 (Mo. App. E.D. 1980) ("Fraud of course is never to be presumed; and before evidence may be taken as reasonably supporting an inference of fraud, it must rise above mere suspicion and point logically and convincingly to that conclusion." (citing *Hunter v. Roberts*, 267 S.W.2d 368, 372 (Mo. App. 1954)).  Defendants may present even circumstantial evidence of fraud, however:  "Fraud is rarely susceptible of positive proof . . . fraud may be established by a showing of facts and circumstances from which it reasonably and fairly may be inferred."  *Id.* at 634–35 (internal quotations omitted) (quoting *Glaze v. Glaze*, 311 S.W.2d 575, 578–579 (Mo. App. 1958).  The Court finds that Defendants have presented sufficient evidence to create a genuine issue of fact under each of the elements for fraudulent inducement.

After drawing all reasonable inferences in favor of Defendants, the Court finds that factual disputes exist over whether Robson misrepresented that the Duckpond valuation spreadsheets were GAAP-compliant to induce them into entering the Purchase Agreement.  A reasonable jury could find that Robson represented, through the valuation spreadsheets, that the purchase price was GAAP-compliant because Robson labeled the spreadsheets "Duckpond Purchase Price per Article VI of the Amended and Restated Shareholders Agreement for Duckpond Ltd."  Doc. 88 at ¶ 26.  Defendants also present evidence that Robson's representation

was material because it caused them to accept Robson's purchase price and enter into the Purchase Agreement and promissory note.  *Schoen v. Lang*e, 256 S.W.2d 277, 281 (Mo. App. 1953) ("[A] representation is material if it relates directly to the matter in controversy and is of such a nature that the ultimate result would not have followed if there had been no representation, or if the one who acted upon it had been aware of its falsity.").  Defendants have presented sufficient evidence of Robson's knowledge and intent because Robson admitted in his deposition that he knew Hummer and Alexandrov relied on the Duckpond valuation spreadsheet to determine his buyout price but he failed to inform them that the valuation was not GAAP compliant.  Robson Dep. 72:22–23, 75:24–76:1, 77:1–3, 81:3–9, 84:4–8; *see also Constance v. B.B.C. Development Co.*, 25 S.W.3d 571, 588 (Mo. App. W.D. 2000) (questions of intent in a fraud action "often present witness credibility issues, that lie within the peculiar province of the jury.").

Defendants have also established genuine issues of fact over whether they knew Robson's statements were false and had a right to rely on his representations.  Defendants state that they did not know until late 2018 that Robson's Duckpond valuation contained non-GAAP-compliant financials and that they took Robson's calculations at face value because they believed that he calculated the purchase price under Article VI of the Shareholders' Agreement.  Doc. 88 at ¶¶ 45–46.  Despite the Defendants' equal footing with Robson and access to information regarding the buyout price, "if the seller makes a distinct and specific representation, the buyer has the right to rely thereon."  *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 691 (Mo.App. E.D. 1994).  Additionally, "[t]he right to rely on a representation is ordinarily a question of fact for the trier of fact."  *Kratky v. Musil*, 969 S.W.2d 371, 376 (Mo. App. W.D. 1998).  Finally, Defendants put forth evidence that Robson's representations proximately caused them damages,

due to their overpayment on the promissory note as well as other expenses stemming from Duckpond's non-GAAP-compliant financials.  Doc. 88 at ¶55–56.

Robson counters that Defendants' affirmative defenses and counterclaims fail as a matter of law:  Defendants consented to the terms in the Purchase Agreement and waived the restrictions in the Shareholders' Agreement (including the GAAP-compliance provision in Article VI), therefore, Defendants cannot bring a claim for fraud.  Doc. 40.  Robson contends that Defendants waived the basis for their affirmative defenses and counterclaims through Section 2.3 of the Purchase Agreement:

> "[t]he Parties hereby waive any and all restrictions and conditions in the Shareholders Agreement and the Articles or any other document, on the transfer of shares in respect of Transfers . . . and hereby consent to the Transfers and all of their terms, including but not limited to the Purchase Price. For the avoidance of doubt, the Parties agree that the Transfers are in compliance with the Shareholders Agreement and the Articles."

Docs. 40, 44 at ¶ 7.  Robson argues that the Purchase Agreement and promissory note supersede all prior agreements between the parties, including the Shareholders' Agreement, so the purchase price did not have to satisfy the price formula in Article VI or come from a GAAP-compliant Duckpond valuation.  Doc. 40.  Robson also observes that even if the Shareholders' Agreement was still in effect, Article VI's price formula for death, disability, and retirement still did not apply because Robson never retired from the Duckpond group of companies; he became an employee of ICC, Inc. after selling his shares.  *Id.*  In sum, Robson asserts that his alleged misrepresentations about GAAP compliance are not actionable or relevant because Defendants waived the restrictions in the Shareholders' Agreement and because the purchase price did not have to comply with Article VI since he never retired.  *Id.*

Robson fundamentally misinterprets the basis for Defendants' counterclaims and affirmative defenses.  Defendants claim that the Purchase Agreement and promissory note are

voidable because Robson misrepresented whether the valuation spreadsheets were GAAP-compliant under Article VI of the Shareholders' Agreement.  Doc. 25.  Parties cannot waive claims of fraudulent inducement by agreement:  "Missouri law . . . holds that a party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract."  *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 767 (Mo. 2007); *see also Wagner v. Uffman*, 885 S.W.2d 783, 786 (Mo. App. 1994) ("A party may not contractually exclude oneself from fraud through the use of general disclaimers.").

Robson's misrepresentations about GAAP compliance are actionable so long as Defendants rightfully relied upon them in determining the price for Robson's stock and entering the Purchase Agreement.  Defendants have testified and presented evidence that that they never would have bought Robson's shares for $3,170,000 if they had known that the valuation spreadsheet was not GAAP-compliant.  Doc. 88 at ¶ 39.  Even assuming that Defendants waived the restrictions in Shareholders' Agreement by signing the Purchase Agreement, Defendants may still bring a claim for fraudulent inducement of the Purchase Agreement based on Robson's misrepresentations about GAAP compliance.  *See Hess*, 220 S.W.3d at 767.

Because Defendants present genuine issues of fact over whether Robson fraudulently induced them to enter the Purchase Agreement and promissory note, the Court denies Robson's Motion for Summary Judgment, Doc. 39.  The Court need not address at this time whether Defendants waived the restrictions in the Shareholders' Agreement by entering the Purchase Agreement or whether Robson retired for purposes of Article VI of the Shareholders' Agreement.

### 2.    Defendants' partial motion for summary judgment

Defendants also move for summary judgment based on their affirmative defenses and counterclaim for fraud, urging that Robson fraudulently induced the Purchase Agreement and promissory note by representing that the purchase price was based on GAAP-compliant financials in accordance with Article VI of the Shareholders' Agreement.  Docs. 79, 80. Defendants assert that Robson has not presented sufficient evidence to create a genuine dispute of material fact as to any of these issues, so they are entitled to summary judgment on their fraud affirmative defenses and fraud counterclaim against Robson.  *Id.*

The Court disagrees.  As discussed above, fraudulent inducement requires a party to prove:  "(1) a false material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the statement; (5) the hearer's reliance on its truth, and the right to rely thereon; and (6) proximate injury."  *Gast*, 739 S.W.2d at 547.

The Court finds that Robson has presented sufficient evidence to create a genuine dispute of fact on whether he committed fraud.  *See id.*  Robson presents evidence that he never actually told Defendants that the stock price was calculated based on GAAP-compliant financials and that Defendants already knew that Duckpond's financials were not GAAP compliant.  Doc. 88 at ¶¶ 35–37, 51.  Robson also presents evidence that he did not intend for Defendants to act upon his representations in the valuation spreadsheets and that he did not prepare the spreadsheets for the purpose of determining his buyout price.  *Id.* at ¶¶ 29, 58.  Resolving these factual disputes over fraudulent misrepresentation will involve witness credibility determinations and the weighing of contrary evidence, both of which "lie within the peculiar province of the jury."  *Constance v.*

*B.B.C. Development Co.*, 25 S.W.3d 571, 588 (Mo. App. Ct. 2000).  The Court therefore denies Defendants' Partial Motion for Summary Judgment [79].

### 3.      Robson's partial motion for summary judgment

Robson also moves for partial summary judgment on several of Defendants' damage claims, claiming that Defendants are either not the proper parties to claim the damages or that they present insufficient evidence to support recovery.  Doc. 74.  First, Robson argues that Defendants are not the proper parties to claim damages related to the forgiveness of a promissory note owed by Ryan Coates to Stichting Duckpond Foundation, because Stichting Duckpond Foundation is not a party to this lawsuit.[1]  *Id.*  Second, Robson argues that various employee compensation, recruitment, and bonus damages claimed by Defendants were all paid by ICC, Inc., which is also not a party to this lawsuit.  *Id.*  Third, Robson argues that Defendants cannot prevail on their damage claims for the RubinBrown review costs and excessive employee bonuses and other expenses from 2018 because Defendants present insufficient evidence to show that the damages were a proximate cause of Robson's actions.  *Id.*

Awarding partial summary judgment for Robson on Defendants' damage claims would constitute an improper advisory opinion.  *See, e.g., Flast v. Cohen*, 392 U.S. 83, 88 (1968) ("The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions.").  For a federal court to render judgment, the issue before it must be:

> definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

---

[1] Both Ryan Coates and Stichting Duckpond Foundation are non-parties in this action.  Doc. 44 at ¶¶ 12–13; Doc. 95 at 3–4.  Ryan Coates bought 10% of Duckpond's shares in April 2018, and ICC Global and Tharros loaned Coates $555,366 to finance the purchase.  *Id.*  ICC Global and Tharros loaned the money through a corporate intermediary, Stichting Duckpond Foundation, but they forgave the loan after discovering that Duckpond's financials were not GAAP compliant.  *Id.*

*North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–241 (1937)).  Robson seeks a ruling from the Court on the extent of Defendants' damages, should Defendants succeed in proving Robson's liability for fraud and breach of fiduciary duties.  Doc. 74.  But as discussed above, genuine issues of material fact exist on the question of whether Robson fraudulently induced Defendants to enter the Purchase Agreement.

Awarding partial summary judgment on damages issues "which depend upon the resolution of controverted matters would be tantamount to advisory opinions." *Marshall Contractors, Inc. v. Peerless Ins. Co.*, 827 F. Supp. 91, 93 (D.R.I. 1993); *see also Coy v. No Limits Education*, 2016 WL 7911333, at *3 (D. Minn. 2016) ("The Court will not offer an advisory opinion on the applicability of various damages theories that might apply in the alternative.").  Liability for Defendants' fraud and breach of fiduciary duty counterclaims is an unresolved threshold issue that the factfinder must resolve before the Court can address the question of Defendants' damage claims.  Robson seeks a ruling on damages issues that the Court may never need to resolve, placing the Court "in the untenable position of being asked to render an advisory opinion on a hypothetical determination of critical facts." *Borup v. CJS Solutions Group, LLC*, 2019 WL 4820732, at *1 (D. Minn. 2019) (quoting *Boden v. St. Elizabeth Med. Ctr., Inc.*, 2018 WL 4855210, at *4 (E.D. Ky. 2018)).  The Court therefore denies Robson's Motion for Partial Summary Judgment.  Doc. 74.

### B. Motions to exclude expert testimony

Robson filed motions to exclude the expert testimony of H. Bryan Callahan and Brett Abelson, Docs. 72 and 77.  Defendants filed a motion to exclude the expert testimony of Thomas Hilton, Doc. 69.  The Court will address each motion in turn.

To be admissible, Federal Rule of Evidence 702 requires that expert testimony:  (1) help the trier of fact determine facts at issue; (2) be based on sufficient facts or data; and (3) be the product of reliable principles and methods.  In addition, the expert must have reliably applied those principles and methods to facts of the case.  *Id.*  The Court must act as a "gatekeeper" in determining the admissibility of expert testimony and "determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)).

### 1.      Defendants' expert H. Bryan Callahan

Defendants' expert H. Bryan Callahan is a CPA and a partner in the Forensics and Valuation Services practice of BKD, LLP, a large CPA and advisory firm.  Doc. 78-1 at 4.  Defendants retained Callahan "to assess Robson's calculation of damages and determine applicable adjustments required to recalculate Robson's valuation of Duckpond and its subsidiaries as defined in Article VI of the Shareholders' Agreement."  *Id.* at 5.  Callahan opined that the proper valuation for Robson's buyout under Article VI of the Shareholders' Agreement was "no more than $1,146,106.16, but the value is likely lower due to other forgone revenue recognition adjustments and the Duckpond Consolidated balance sheets as updated with [RubinBrown's adjusting journal entries] . . ."  *Id.* at 10.  Callahan based his Duckpond valuation on GAAP adjustments related to: "(1) the proper consolidation of a Duckpond subsidiary, 301 Memorial LLC; and (2) proper revenue recognition for certain projects, for which sufficient information remained available."  *Id.* at 7–10.

Robson does not challenge Callahan's qualifications.  Instead, Robson argues that the Court should exclude certain opinions Callahan expressed because he did not rely on reliable

principles or methods.  Doc. 78.  First, Robson seeks to exclude Callahan's opinion that the

foregone revenue-recognition adjustments might have reduced the value of Robson's interest in

Duckpond to less than $1,146,106.16.  *Id.*  Second, Robson seeks to exclude Callahan's opinion

on the consolidation of 301 Memorial.  *Id.*

### a.        Foregone revenue-recognition adjustments

Callahan's valuation opinion includes revenue-recognition adjustments that he argues

should have been included in the Duckpond valuation as of March 31, 2017.  Doc. 78-1 at 9–10.

Callahan reviewed a combination of forecasted numbers, budgets, contract/purchase orders, job

cost detail/invoice registers, and other data for eight projects.  *Id.*  Callahan reviewed similar

adjustments to balance sheets for several other projects, but Callahan did not have enough

detailed information on these projects to include those "foregone revenue recognition

adjustments" in his valuation opinion.  *Id.* at 10.  After considering Duckpond's adjusted balance

sheet and project information, as well as RubinBrown's adjusting journal entries, Callahan stated

that the value of Robson's shares was "no more than $1,146,106.16," but he also claimed that

this valuation was "conservative" and that Robson's actual buyout value was "likely lower."  *Id.*

Callahan did not include the foregone revenue-recognition adjustments in his official valuation,

but he went on to calculate the possible effect of those adjustments on the valuation anyway,

suggesting that Robson's stock value could have been as little as $733,915.82 due to those

adjustments.  *Id.*

Robson seeks to exclude Callahan's opinion on the foregone revenue-recognition

adjustments as speculative and unreliable.  Doc. 78-1 at 10.  Callahan admitted in his report that

he "was unable to calculate reliable revenue recognition adjustments for the other Fixed Fee

projects."  *Id.*  But he explained that his opinions on the foregone revenue-recognition

adjustments were based on estimated forecasted costs only because Duckpond's accounting

system no longer contained the actual-cost data.  Doc. 78-1 at 10.

Callahan also opined that his $1,146,106.16 valuation was "conservative" and that the

value was "likely lower" than $1,146,106.16.  Doc. 78-1 at 10.  Callahan stated that "the value is

likely lower due to other forgone revenue recognition adjustments and the Duckpond

Consolidated balance sheets as updated with RB's AJEs."  Doc. 78-1 at 10.  These comments

were based on his review of Duckpond's financial statements and project data as well as

RubinBrown's adjusted journal entries.  *Id.*

Callahan's opinions on the foregone revenue-recognition adjustments are not "so

fundamentally unsupported that [they] can offer no assistance to the jury."  *Synergetics, Inc. v.*

*Hurst*, 477 F.3d 949, 956 (8th Cir. 2007).  "As a general rule, the factual basis of an expert

opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing

party to examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Tech.,*

*Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).  The Court will not exclude Callahan's opinions on the

foregone revenue-recognition adjustments.

### b.      301 Memorial consolidation

Callahan also opined that under GAAP consolidation guidance, the Duckpond valuation

should have consolidated 301 Memorial due to ICC, Inc.'s 99% interest in 301 Memorial.  Doc.

78-1 at 8–9.  Callahan cited Financial Accounting Standards Board ("FASB") Codification ASC

810-10-15-8, a general consolidation rule based on an entity's majority voting-interest in another

corporation ("voting-interest model").  *Id.*  Robson seeks to exclude Callahan's opinion on the

consolidation of 301 Memorial for failing to consider an exception to the voting-interest model

that Robson's rebuttal expert, Hilton, claimed would apply in this circumstance.  Doc. 78.  The

Court observes that Callahan supplemented his report to analyze the applicability of this exception to the voting-interest model in the context of the 301 Memorial consolidation.  Doc. 110; 66-4.

Callahan opined in his supplemental report that the exception to the voting-interest model does not apply here, because three out of four of the non-controlling-members of 301 Memorial were the three shareholders in Duckpond:  Robson, ICC Global, and Tharros.  Doc. 66-4 at 6–7. Callahan concluded that Duckpond "directly or indirectly" held 99.75% of the voting rights in 301 Memorial, so the Duckpond financial statements should have consolidated 301 Memorial. *Id.* at 7.  The Court finds that Callahan's supplemental opinion meets the relevance and reliability requirements of Rule 702 because Defendants have shown by a preponderance of evidence that Callahan's reasoning and methodology "[was] applied properly to the facts in issue" and that Callahan was "qualified to render the opinion and that the methodology underlying his conclusions [was] scientifically valid."  *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006) ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.").  Therefore, the Court will not exclude Callahan's opinion on the 301 Memorial consolidation.  The Court denies Robson's motion, Doc. 77.

### 2.    Defendants' expert Brett Abelson

Defendants' expert Brett Abelson is a CPA and the CFO of ICC, Inc. since 2018.  Doc. 73-1 at 2.  Defendants present Abelson as a non-retained expert to opine that Robson based his Duckpond valuation on non-GAAP-compliant financials and to testify about the financial statements and valuation documents that Duckpond used for Robson's buyout in 2017.  *Id.* Defendants further state that Abelson will opine that Duckpond's consolidated financials

21

contained material misstatements, resulting in an inflated price for Robson's stock.  *Id.*  Robson argues that the Court should prevent Abelson from offering opinion testimony as a non-retained expert because he has no personal knowledge of the facts surrounding the sale of Robson's interest in Duckpond and because Abelson's opinions will be needlessly cumulative of Callahan's expert testimony.  Doc. 73.  While the Court observes that Abelson's ability to determine the alleged inflated value undercuts Defendants' argument that they could not have discovered the true value of the stock earlier, the Court will allow Abelson to testify as set forth below.

### a.      Personal knowledge as a non-retained expert

Robson argues that because Abelson started working at ICC, Inc. in 2018, a year after Robson's buyout, Abelson does not have personal knowledge of the facts at issue.  Doc. 73.  Robson correctly asserts that non-retained experts may only testify to facts within their personal knowledge.  *See InfoDeli, LLC v. Western Robidoux, Inc.*, 2018 WL 10638455, at *2 (W.D. Mo. 2018) (prohibiting a non-retained expert "from testifying about any information learned or compiled during the discovery process in this case since that testimony would not be based on percipient knowledge of the underlying dispute.").  According to Robson, Abelson's testimony would simply summarize facts taken from the discovery record.  The Court disagrees with Robson's characterization of Abelson's testimony.  Abelson's testimony is not based on an after-the-fact review of discovery documents; Abelson personally assisted Defendants in conducting an internal audit of Robson's Duckpond valuation and stock buyout price in 2018.  Doc. 86.  Abelson also worked with Duckpond's independent auditor, RubinBrown, to identify the GAAP-compliance issues in Duckpond's overall financials.  *Id.*  And although Abelson may rely on documents created before his employment at ICC, Inc., he can still testify regarding his

22

knowledge of Duckpond's financial reports, files, and data gained through his experience as ICC Inc.'s CFO. *Id.*

The Court further explains that the issue of the extent of a non-retained expert's personal knowledge goes to the weight of the expert's testimony rather than its admissibility. *Smith v. Curators of the Univ. of Missouri*, 2018 WL 6729653, at *2 (W.D. Mo. 2018) ("Plaintiff also contends [the non-retained expert] should be precluded from testifying to particular time periods or facts due to a lack of personal knowledge. However, *that issue is suited for cross-examination and does not warrant the exclusion of an expert witness*." (emphasis added)) (citing *Synergetics, Inc.*, 477 F.3d at 955–56 (denying a plaintiff's motion to exclude a non-retained expert from testifying, explaining that the factual basis of expert's testimony went to weight rather than admissibility)).

### b.   Cumulative testimony

Robson also contends that the Court should exclude Abelson's opinions as needlessly cumulative under Federal Rule of Evidence 403, because both Abelson and Callahan will opine on the GAAP-compliance issues with Robson's 2017 Duckpond valuation. *See* Fed. R. Evid. 403; *Sellers v. Bayer HealthCare Pharm. Inc.*, 2016 WL 9049600, at *2 (W.D. Mo. 2016) ("Rule 403 of the Federal Rules of Evidence…provides expert testimony should be excluded 'if its probative value is substantially outweighed by a' risk of 'unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'"). Robson claims that Abelson and Callahan's opinions are nearly identical and that they testify from the same professional perspective as CPAs, so the Court should exclude any of Abelson's opinion testimony that contains a "substantial overlap" with Callahan's testimony. *See C.C. v. Suzuki Manufacturing of Am. Corp.*, 2018 WL 3861354, at *13 (E.D. Mo. 2018) ("Expert

23

testimony is unnecessarily cumulative when 'there is 'substantial overlap' between the areas on which two experts will testify.' However, 'testimony on the same topic by different experts...is not needlessly cumulative where the experts will testify from different perspectives.' Generally speaking, experts testify from different professional perspectives when they work in different professions." (internal citations and quotations omitted)).

In response, Defendants state that even when expert testimony overlaps, the testimony is not overly cumulative when it addresses the very "root of the matter in controversy" between the parties. *See J.B. by & through Bullock v. Missouri Baptist Hosp. of Sullivan*, 2018 WL 746302, at *6 (E.D. Mo. 2018) (denying plaintiff's motion to exclude cumulative expert testimony from five experts on the same two opinions and deferring decision to limit cumulative evidence until trial). Defendants admit that courts need not permit limitless expert testimony on the central issue, but they claim that exclusion is unwarranted absent a showing that the prejudicial effect of expert testimony substantially outweighs its probative value. *See id.*

The Court finds that the probative value of Abelson's testimony is not "substantially outweighed" by a danger of "needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. When weighing the probative value of evidence against the considerations in Rule 403, courts generally strike the balance in favor of admission. *Miller v. Bayer HealthCare Pharmaceuticals Inc.*, 2016 WL 9049604, at *1 (W.D. Mo. 2016) (citing *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980)). The GAAP-compliance issues with Robson's 2017 Duckpond valuation lie at the root of the controversy between the parties, so Abelson's testimony has a significant probative value. *See Missouri Baptist Hosp. of Sullivan*, 2018 WL 746302, at *6. And the danger of cumulative evidence is not high. Abelson's testimony comes from a different perspective than Callahan's. *See id.* (refusing to exclude expert testimony when

24

"each expert's background and analysis is unique, and the testimony is complimentary, rather than cumulative."). Both experts have the same professional background as CPAs, but Defendants offer Abelson's testimony as a non-retained expert with personal knowledge of the facts at issue. While Callahan will opine as to a GAAP-compliant Duckpond valuation based on forensic accounting principles, Abelson will recount the GAAP-compliance issues uncovered by Defendants in 2018 and will provide his perspective into Duckpond's financials as ICC, Inc.'s CFO.

### c.      Conclusion on Abelson

The Court holds that Abelson can testify as Defendants' non-retained expert to the extent that his opinions stem from facts within his personal knowledge. And the Court will not exclude Abelson's testimony on the basis of Rule 403, although it may limit Abelson's testimony should his opinions become unnecessarily cumulative during trial. The Court denies Robson's motion to exclude, Doc. 72.

### 3.      Plaintiffs' rebuttal expert Thomas Hilton

Plaintiff's expert Thomas Hilton is a CPA and a partner at Anders Minkler Huber & Helm, LLP. Doc. 70-2 at 1. Plaintiffs retained Hilton "to review and rebut certain opinions of the Defendants' expert witness contained in the expert report of H. Bryan Callahan." *Id.* at 2. Hilton expressed that Callahan's opinion regarding the 301 Memorial consolidation was incorrect because of an exception to the voting-interest model (FASB ASC 810-10-15-10(a)) that Callahan did not address. *Id.* at 4. According to Hilton, even though ICC, Inc. had a 99% ownership interest in 301 Memorial, the non-controlling-member rights in the 301 Memorial Operating Agreement were so restrictive as to call into question ICC, Inc.'s control over 301 Memorial. *Id.* at 5–6. Hilton concluded that GAAP did not require the consolidation of 301

Memorial in Duckpond's financial statements and that Callahan's opinion on the value of Robson's Duckpond shares was incorrect.  *Id.* at 6.

Defendants argue that Hilton's testimony is: (1) ill-supported, because Hilton did not consider alternative rationales for consolidation, and (2) unreliable, because Hilton did not conduct an adequate analysis to support his conclusion.  Doc. 70.  First, Defendants argue that Hilton's opinion on the 301 Memorial consolidation is ill-supported because Hilton narrowly considered one possible exception to the voting-interest model but did not analyze consolidation under an alternative rationale, such as the variable-interest model (a/k/a, economic-influence model).  *Id.*  Second, Defendants argue that Hilton's attack on Callahan's valuation opinion is unreliable because Hilton did not address other possible rationales for consolidation that would support Callahan's valuation opinion.  *Id.*

### a.    301 Memorial consolidation

Hilton opined that Callahan did not need to consolidate 301 Memorial under GAAP consolidation guidance because of an exception to the voting-interest model.  Doc. 70-2 at 5–6.  Hilton admitted that "ASC 810 considers consolidation under one of two models: an economic-influence model or a voting-interest model," but as a rebuttal witness, Hilton explained that "[f]or purposes of this report, I am addressing the voting-interest model utilized by Mr. Callahan in his calculations and report."  *Id.* at 3.  Defendants seek to exclude Hilton's rebuttal opinion on the consolidation of 301 Memorial for failing to analyze alternative rationales for consolidation, like the variable-interest model.  Doc. 70.

The Court observes, as an initial matter, that Defendants seek to exclude Hilton's testimony for not addressing the variable-interest model, despite Callahan's not raising this rationale in his original report.  Doc. 78-1.  On the very last day of discovery, Defendants filed a

supplemental report for Callahan with a new analysis of the variable-interest model.  Doc. 66-4.
The Court struck this portion of Callahan's supplemental report, holding that it constituted a
"new opinion" on consolidation that could not enter the record for the first time through a
supplemental report.  Doc. 110.  As the rebuttal expert for Callahan, Hilton could not possibly
have predicted or responded to Callahan's untimely disclosure.

Additionally, Hilton need not address every possible rationale for the 301 Memorial
consolidation.  Hilton is a rebuttal expert, and "[t]he function of rebuttal testimony is to explain,
repel, counteract or disprove evidence of the adverse party."  *Marmo v. Tyson Fresh Meats, Inc.*,
457 F.3d 748, 759 (8th Cir. 2006) ("[R]ebuttal evidence may be used to challenge the evidence
or theory of an opponent—and not to establish a case-in-chief."); *see also Aviva Sports, Inc. v.
Fingerhut Direct Marketing, Inc.*, 829 F.Supp.2d 802, 835 (D. Minn. 2011) (collecting cases)
(rebuttal expert witnesses may criticize other experts' theories without offering their own
alternative analysis, and "[c]ontrary to plaintiffs' suggestion, a rebuttal expert who critiques
another expert's theories or conclusions need not offer his own independent theories or
conclusions.").

The Court finds that Hilton's failure to address alternative rationales for the 301
Memorial consolidation is not a basis for excluding his testimony, rather, this argument goes to
the weight of Hilton's testimony.  *See Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th
Cir. 2000) ("Attacks on the foundation for an expert's opinion, as well as the expert's
conclusions, go to the weight rather than the admissibility of the expert's testimony.").  The
Court will not exclude Hilton's rebuttal opinion on this basis.

###### b.        Valuation

Hilton concluded in his report that Callahan's recalculation of Robson's stock buyout price was "incorrect" because it relied on the 301 Memorial consolidation and because Callahan had ignored the exception to the voting-interest model.  Doc. 70-2 at 6 ("[P]ursuant to the exception of ASC 810-10-15-10-(a)(1)(iv), Memorial should not be consolidated with Duckpond . . . Callahan's recalculation of the purchase price of the shares . . . which was based upon the consolidation of Memorial with Duckpond, Ltd. and Subsidiaries, is incorrect.").  Defendants urge that Hilton's overarching conclusion is unreliable because of the "analytical gap" between Hilton's opinion on the voting-interest model and Hilton's conclusion that 301 Memorial should not have been consolidated at all.  Doc. 70; 87.  Defendants challenge the foundation for Hilton's opinion that 301 Memorial should not have been consolidated, because that conclusion does not necessarily flow from the rest of Hilton's opinion.  *Id.*  To reach that conclusion, Defendants contend, Hilton would have had to analyze both the voting-interest model and the variable-interest model for consolidation.  *Id.*

Usually, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997) (quoting *Hose v. Chicago Northwestern Transportation Co.*, 70 F.3d 968, 974 (8th Cir.1995)).  The Court will exclude an expert's opinion, however, if it "is so fundamentally unsupported that it can offer no assistance to the jury."  *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416–17 (8th Cir. 2005) (affirming exclusion of expert's damages calculation testimony because it "failed to take into account a plethora of specific facts").

The Court will not exclude Hilton's conclusion, because Hilton's failure to address the variable-interest model does not make it "fundamentally unsupported" by the relevant facts. *See Nebraska Plastics, Inc.*, 408 F.3d at 416. Hilton's conclusion that "Memorial should not be consolidated with Duckpond" is based on his rebuttal of Callahan's opinion, rather than his own analysis of the consolidation guidelines. Doc. 70-2 at 6. But Defendants may address the limited basis for Hilton's opinion on cross examination. *See Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."); *see also Trisko*, 226 F.3d at 955. Accordingly, the Court denies Defendants' motion to exclude [69].

## IV.   Conclusion

Genuine disputes of material fact exist as to whether Robson misrepresented that the Duckpond valuation was GAAP-compliant and fraudulently induced Defendants to enter the Purchase Agreement for Robson's shares. Accordingly, the Court denies Robson's [39] Motion for Summary Judgment and Defendants' [79] Partial Motion for Summary Judgment. The Court also denies Robson's [74] Motion for Partial Summary Judgment, as it seeks an advisory opinion.

The Court denies Robson's [77] Motion to Exclude Callahan's Expert Testimony, Robson's [72] Motion to Exclude Abelson's Expert Testimony, and Defendants' [69] Motion to Exclude Hilton's Expert Testimony.

So Ordered this 31st day of March 2021.

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**